PHILIP A. GASTEIER (SBN 130043)
JACQUELINE L. JAMES (SBN 198838)
LINDSEY L. SMITH (SBN 265401)
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone: (310) 229-1234
Facsimile: (310) 229-1244
Email: pag@lnbyb.com; jlj@lnbyb.com; lls@lnbyb.com

Attorneys for David Gottlieb, Chapter 7 Trustee

# UNITED STATES BANKRUPTCY COURT

# CENTRAL DISTRICT OF CALIFORNIA

# (SAN FERNANDO VALLEY DIVISION)

| | |
|---|---|
| In re | ) Case No. 1:00-bk-19189-AA |
| INTELLISYS GROUP, INC., | ) |
| | ) Chapter 7 |
| Debtor. | ) **NOTICE OF MOTION AND MOTION** |
| | ) **FOR ORDER DISALLOWING** |
| | ) **PRIORITY TREAMENT FOR THE** |
| | ) **MAJORITY OF CLAIM NO. 739;** |
| | ) **MEMORANDUM OF POINTS AND** |
| | ) **AUTHORITIES; DECLARATION OF** |
| | ) **DAVID GOTTLIEB IN SUPPORT** |
| | ) **THEREOF** |
| | ) |
| | ) Date:    March 7, 2012 |
| | ) Time:    10:30 a.m. |
| | ) Place:    Courtroom "303" |
| | )          21041 Burbank Blvd. |
| | )          Woodland Hills, California |

1

**TO THE HONORABLE ALAN M. AHART, UNITED STATES BANKRUPTCY JUDGE, THE OFFICE OF THE UNITED STATES TRUSTEE, CLAIMANT AND ITS COUNSEL:**

**PLEASE TAKE NOTICE** that on March 7, 2012 at 10:30 a.m., the Honorable Alan M. Ahart, United States Bankruptcy Judge, will hold a hearing in Courtroom "303" of the United States Bankruptcy Court for the Central District of California, San Fernando Valley Division, located at 21041 Burbank Blvd., Woodland Hills, California, to consider the motion (the "Motion") filed by David Gottlieb, the duly appointed Chapter 7 trustee (the "Trustee") for the bankruptcy estate of Intellisys Group, Inc. (the "Debtor"), seeking the entry of an order allowing the claim filed by Michael Dennis, on or about February 20, 2001, which claim was denominated by the Clerk of the Court as Claim No. 739 ("Claim No. 739"), and which asserts an entitlement to a priority claim in an unknown amount and a total claim in the amount of $157,200.33, but only allowing Claim No. 739 as a priority claim in the amount of $4,300 and only allowing the remainder of Claim No. 739 as a general unsecured claim.

**PLEASE READ THIS DOCUMENT CAREFULLY TO DETERMINE THE BASIS FOR THE TRUSTEE'S OBJECTION TO YOUR CLAIM.** The specific grounds for the Motion are set forth in detail in the attached Memorandum of Points and Authorities.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to Local Bankruptcy Rules 3007-1(b)(3)(A) and 9013-1(f), any response to the Motion must be in writing and filed with the Clerk of the Bankruptcy Court and served upon the United States Trustee and the Trustee and his counsel at the address set forth in the upper left-hand corner of the first page hereof not later than fourteen (14) days prior to the scheduled hearing date set forth above.

///
///
///
///
///
///

**PLEASE TAKE FURTHER NOTICE** that, pursuant to Local Bankruptcy Rule 3007-1(b)(3)(B), the Court may deem the failure of a party in interest to file a timely response to the Motion to constitute consent to the granting by the Court of the relief requested by the Trustee in the Motion without further notice or hearing.

Dated: January 27, 2012                     DAVID GOTTLIEB, CHAPTER 7 TRUSTEE


                                            By:___ */s/ Lindsey L. Smith*_____ ___
                                                 PHILIP A. GASTEIER
                                                 JACQUELINE L. JAMES
                                                 LINDSEY L. SMITH
                                                 LEVENE, NEALE, BENDER,
                                                      YOO & BRILL L.L.P.
                                                 Attorneys for David Gottlieb,
                                                 Chapter 7 Trustee

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## STATEMENT OF FACTS & OBJECTIONS TO CLAIMS

### A.    Background

On October 11, 2000 (the "Petition Date"), Intellisys Group, Inc. (the "Debtor"), filed a voluntary petition under Chapter 11 of 11 U.S.C. § 101 *et seq.* (as amended, the "Bankruptcy Code").

On January 10, 2001, the Court entered an order converting the Debtor's case to one under Chapter 7 of the Bankruptcy Code. Thereafter, David Gottlieb was appointed as the chapter 7 trustee for the Debtor's bankruptcy estate (the "Trustee").

Pursuant to an order entered by the Court on May 24, 2004, the bar date for filing proofs of claim or interest in the Debtor's bankruptcy case was July 23, 2004 (the "Bar Date").

### B.    The Claims Analysis

In connection with analyzing the claims filed in the Debtor's case, the Trustee and his counsel obtained copies of all available proofs of claim and interest filed in the Debtor's case from the Clerk's Office of the United States Bankruptcy Court for the Central District of California – San Fernando Valley Division.  Upon obtaining copies of such proofs of claim and interest, the Trustee analyzed all of the documentation filed by the respective putative creditors and interest holders in support of the claims, and attempted to reconcile such filed claims against the Debtor's books and records.  Based on the foregoing, the Trustee has determined that the above referenced claim is objectionable because the claim does not specify the amount of the claim which is entitled to priority.

### C.    Claim No. 739 filed by Michael Dennis

On February 20, 2001, Michael Dennis ("Dennis") filed a proof of claim in the Debtor's

case, which claim was denominated by the Clerk of the Court as Claim No. 739 ("Claim No. 739"). A true and correct copy of Claim No. 739 is attached as **Exhibit "739"** to the Declaration of David Gottlieb annexed hereto (the "Gottlieb Declaration"). Pursuant to Claim No. 739, Dennis asserts a total claim in the amount of $157,200.33 with an unknown portion entitled to priority. The basis for Claim No. 739 is alleged to be unpaid wages earned by Dennis.

The Trustee objects to Claim No. 739 on the grounds that it asserts a priority claim but does not specify what amount of Claim No. 739 is entitled to priority.  On the Petition Date, 11 U.S.C. § 507 (a)(3) provided that the maximum allowed priority amount for priority claims based upon wages and salaries was $4,300. Based on the Debtor's books and records and since Claim No. 739 asserts an entitlement to a priority claim in an unknown amount for wages, the Trustee submits that Claim No. 739 should be allowed as a priority claim in the amount of $4,300 and the remainder of the claim should be allowed as a general unsecured claim.  Based on the foregoing, the Trustee respectfully requests that the Court allow Claim No. 739 but only as a priority claim in the amount of $4,300 and as a general unsecured claim in the amount of $152,900.33.

## II.

## APPLICABLE LAW

Section 507 of the Bankruptcy Code provides the order by which expenses and claims are to be paid. Section 507(a)(4)(A) currently provides:

> (a) the following expenses and claims have priority in the following order:
> (4) Fourth, allowed unsecured claims, but only to the extent of $10,950 for an individual or corporation, as the case may be, earned with within 180 days before the date of the filing of the petition or the date of cessation of the debtor's business, whichever occurs first for-
> (A)    wages, salaries, or commissions including vacation, severance, and sick leave, earned by an individual.

1    11 U.S.C. § 507(a)(4)(A).

2    However, on the Petition Date, the applicable portion of Section 507

3    provided that:

4           (a) the following expenses and claims have priority in the following
5           order:
            (3) Third, allowed unsecured claims, but only to the extent of
6           **$4,300** for an individual or corporation, as the case may be, earned
            with within 180 days before the date of the filing of the petition or
7           the date of cessation of the debtor's business, whichever occurs first
            for-
8                  (A)      wages, salaries, or commissions including vacation,
9           severance, and sick leave, earned by an individual.

10   Section 104 of the Bankruptcy Code provides for the updating in dollar amounts specified

11   in the Bankruptcy Code so that such amounts will reflect changes in the cost of living. In

12   pertinent part, Section 104 reads:

13
14          (a) On April 1, 1998, and at each 3 year interval ending on April 1
            thereafter, each dollar amount in effect under section…507(a) shall
15          be adjusted -
                   (1) to reflect the change in the Consumer Price Index…
16          (c) Adjustments made in accordance with subsection (a) shall not
            apply with respect to cases commenced before the date of such
17          adjustments.

18   11 U.S.C. § 104

19   Notwithstanding the foregoing, "[t]he automatic adjustments to dollar limits made under

20   section 104 have no effect in cases that are already pending on the date the adjustment occurs." 2

21   COLLIER ON BANKRUPTCY ¶ 104.03[3] (Alan N. Resnik & Henry J. Somme eds., 15th ed. rev.).

22   Therefore, the adjustments provided for under subsection (a) do not apply to cases commenced

23   before the date of such adjustments and the dollar limits in effect on the date the case was filed

24   shall apply in the case instead. 2 COLLIER ON BANKRUPTCY ¶ 104.03[3] (Alan N. Resnik & Henry

25

26   J. Somme eds., 15th ed. rev.).

27   Since on the Petition Date, 11 U.S.C. § 507 (a)(3) provided that the maximum allowed

28

priority amount for priority claims based upon wages and salaries was $4,300, the allowed amount of a priority claim based on Section 507(a)(3) filed in this case cannot exceed $4,300. As a result of the foregoing, the priority amount of Claim No. 739 should be capped at $4,300 and the remaining portion of Claim No. 739 should only be allowed as a general unsecured claim as requested above.

## III.

## RESERVATION OF RIGHTS

The Trustee expressly reserves the right to amend, modify or supplement the Motion and to assert additional objections to Claim No. 739 or any other proofs of claim (filed or not) that may be asserted against the Debtor by the aforementioned claimant. Should the grounds for disallowance of Claim No. 739 stated in the Motion be deemed insufficient, the Trustee reserves his rights to object on any other grounds that the Trustee discovers during the time that this case is pending.

## IV.

## CONCLUSION

For the reasons set forth above, the Trustee respectfully requests the entry of an order:

(i)    granting the Motion in its entirety;

(ii)    sustaining the Trustee's objection to Claim No. 739

(iii)    allowing Claim No. 739 but only as a priority claim in the amount of $4,300 and as a general unsecured claim in the amount of $152,900.33; and

/ / /

/ / /

/ / /

/ / /

1          (iv)    granting such other and further relief the Court deems just and proper

2    under the circumstances.

3    Dated: January 27, 2012                    DAVID GOTTLIEB, CHAPTER 7 TRUSTEE

4

5

6                                          By: /s/ Lindsey L. Smith
                                               PHILIP A. GASTEIER
7                                              JACQUELINE L. JAMES
                                               LINDSEY L. SMITH
8                                              LEVENE, NEALE, BENDER,
                                                   YOO & BRILL L.L.P.
9                                          Attorneys for David Gottlieb
                                           Chapter 7 Trustee

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### DECLARATION OF DAVID GOTTLIEB

I, DAVID GOTTLIEB, hereby declare as follows:

1.      I am the duly appointed chapter 7 trustee for the bankruptcy estate of Intellisys Group, Inc., the debtor in the above-captioned bankruptcy case (the "Debtor"). I have personal knowledge of the facts set forth below and, if called to testify, I would and could competently testify thereto.

2.      I make this declaration in support of the motion (the "Motion"), attached hereto, for an order disallowing the claims described below. I have reviewed the Motion in its entirety and agree with its contents.

3.      On October 11, 2000 (the "Petition Date"), the Debtor filed a voluntary petition under Chapter 11 of 11 U.S.C. § 101 *et seq.* (as amended, the "Bankruptcy Code").

4.      On January 10, 2001, the Court entered an order converting the Debtor's case to one under Chapter 7 of the Bankruptcy Code. Thereafter, I was appointed as the chapter 7 trustee for the Debtor's bankruptcy estate.

5.      Pursuant to an order entered by the Court on May 24, 2004, the bar date for filing proofs of claim or interest in the Debtor's bankruptcy case was July 23, 2004 (the "Bar Date").

6.      In connection with analyzing the claims filed in the Debtor's case, my counsel and I obtained copies of all available proofs of claim and interest filed in the Debtor's case from the Clerk's Office of the United States Bankruptcy Court for the Central District of California – San Fernando Valley Division. Upon obtaining copies of such proofs of claim and interest, my counsel and/or my staff and I analyzed all of the documentation filed by the respective putative creditors and interest holders in support of the claims, and attempted to reconcile such filed claims against the Debtor's books and records. Based on the foregoing, I determined that the

above referenced claim is objectionable because the claim does not specify the amount of the claim which is entitled to priority.

7.    On February 20, 2001, Michael Dennis ("Dennis") filed a proof of claim in the Debtor's case, which claim was denominated by the Clerk of the Court as Claim No. 739 ("Claim No. 739"). A true and correct copy of Claim No. 739 is attached hereto as **Exhibit "739."** Pursuant to Claim No. 739, Dennis asserts a total claim in the amount of $157,200.33 with an unknown portion entitled to priority. The basis for Claim No. 739 is alleged to be unpaid wages earned by Dennis.

8.    I object to Claim No. 739 on the grounds that it asserts a priority claim but does not specify what amount of Claim No. 739 is entitled to priority.  Based on the Debtor's books and records and since Claim No. 739 asserts an entitlement to a priority claim in an unknown amount for wages, I submit that Claim No. 739 should be allowed as a priority claim in the amount of $4,300 and the remainder of the claim should be allowed as a general unsecured claim.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this ___ day of January 2012 at Sherman Oaks, California.


_____
DAVID GOTTLIEB

above referenced claim is objectionable because the claim does not specify the amount of the claim which is entitled to priority.

7.     On February 20, 2001, Michael Dennis ("Dennis") filed a proof of claim in the Debtor's case, which claim was denominated by the Clerk of the Court as Claim No. 739 ("Claim No. 739"). A true and correct copy of Claim No. 739 is attached hereto as **Exhibit "739."** Pursuant to Claim No. 739, Dennis asserts a total claim in the amount of $157,200.33 with an unknown portion entitled to priority. The basis for Claim No. 739 is alleged to be unpaid wages earned by Dennis.

8.     I object to Claim No. 739 on the grounds that it asserts a priority claim but does not specify what amount of Claim No. 739 is entitled to priority.  Based on the Debtor's books and records and since Claim No. 739 asserts an entitlement to a priority claim in an unknown amount for wages, I submit that Claim No. 739 should be allowed as a priority claim in the amount of $4,300 and the remainder of the claim should be allowed as a general unsecured claim.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this ____ day of January 2012 at Sherman Oaks, California.

DAVID GOTTLIEB

FORM B10 Official Form 10 Rev. 4-98

| United States Bankruptcy Court   Central District of California | | PROOF OF CLAIM |
|---|---|---|

| Name of Debtor | Case Number |
|---|---|
| INTELLISYS GROUP, INC. | SV 00-19189-KL |

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503

| Name of Creditor (The person or other entity to whom the debtor owes money or property) | ☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars |
|---|---|
| Michael Dennis | 01 FEB 29 AM 10: 33 |
| | |
| Name and address where notices should be sent | ☐ Check box if you have never received any notices from the bankruptcy court in this case |
| Michael L. Kadish, Esq. | ☑ Check box if the address differs from the address on the envelope sent to you by the court |
| George Ereller Associates | |
| 2005 Hamilton Ave. Ste 230 | |
| San Jose, CA 95125 | |
| Telephone number  408 559 6669 | This space is for Court Use Only |

| Account or other number by which creditor identifies debtor | Check here if this claim | ☐ replaces ☐ amends | a previously filed claim, dated: _____ |
|---|---|---|---|

**1. Basis for Claim**
- ☐ Goods sold
- ☐ Services performed
- ☐ Money loaned
- ☐ Personal injury/wrongful death
- ☐ Taxes
- ☑ Other  see Attached

☐ Retiree benefits as defined in 11 U.S.C. § 1114(a)
☑ Wages, salaries, and compensation (Fill out below)
Your SS#: 547 - 39 - 685-3
Unpaid compensation for services performed
from 10/15/00 to 10/31/00
(date) (date)

**2. Date debt was incurred:**

**3. If court judgment, date obtained:**

**4. Total Amount of Claim at Time Case Filed:** $ 157,200.33
If all or part of your claim is secured or entitled to priority, also complete item 5 or 6 below
☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

**5. Secured Claim.**
☐ Check this box if your claim is secured by collateral (including a right of setoff).

Brief Description of Collateral:
☐ Real Estate  ☐ Motor Vehicle
☐ Other _____

Value of Collateral:  $ _____

Amount of arrearage and other charges at time case filed included in secured claim, if any $ _____

**6. Unsecured Priority Claim.**
☑ Check this box if you have an unsecured priority claim
Amount entitled to priority $ _____
Specify the priority of the claim:
☑ Wages, salaries, or commissions (up to $4,300),* earned within 90 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(3)
☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(4)
☐ Up to $1,950* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(6)
☐ Alimony, maintenance, or support owed to a spouse, former spouse, or child - 11 U.S.C. § 507(a)(7)
☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8)
☐ Other - Specify applicable paragraph of 11 U.S.C. § 507(a)(___)
*Amounts are subject to adjustment on 4/1/98 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment

**7. CREDITS:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.
**8. Supporting Documents:** *Attach copies of supporting documents,* such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary.
**9. Date-Stamped Copy:** To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim.

This Space is for Court Use Only

441 wi
739

| Date | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any) |
|---|---|
| 11-13-00 | |

Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571

**EXHIBIT 739 PAGE 11**

## EXHIBIT A TO PROOF OF CLAIM OF MICHAEL DENNIS

| | |
|---|---|
| Wages: | $5,208.33 |
| Commissions: | |
| Q1,Q2 2000 | $26,000.00 |
| 12/99 | $51,992.00 |
| LoudCloud | $50,000.00 |
| Lease of BMW | |
| Automobile: | $24,000.00* |
| | |
| Total: | $157,200.33 |

\* Mr. Dennis was a co-signer on the lease, but the employment agreement with
Intellisys never anticipated that he would be personally liable for the payment.

**EXHIBIT 779 PAGE 12**

**To:**          Delong, Dave
**Cc:**          Ziv, Zohar
**Subject:**    RE: Michael Dennis

Dave,

Michael Dennis receives 50% commission of the salespeople commissions identified in the months below.

(FYI: Salespeople with an asterisk* are on base salary and receive no commission on top of that base salary in the months defined below so their 50% goes to the house.)

**December 99**
Josh Orozco
Jim Casserly *
Graig Murphy
Linda Hammond *

**Jan-Feb-Mar-April**
Josh Orozco
Jim Casserly *
Graig Murphy
Linda Hammond *
Chris Dariano *

**May-June**
Jim Casserly *
Graig Murphy
Chris Dariano *

<u>Exceptions:</u>
Josh Orozco splits 50% on LoudCloud with Michael Dennis to <u>completion</u>.  This means that checks will continue to go to Michael until this job is completely finished. (Under this initial and specific purchase order only.)

<u>Other details:</u>
To date Michael should have received $56,000 in draws for Q1
This would have been paid above his base salary in two consecutive months of May and June. However, Michael believes that the second month, June,  (which was a three paycheck month) may have shorted him by several thousand in draw money on the last paycheck.  Please advise

<u>Deposits:</u>
All deposits received under the salespeople's codes above will also split 50% to Michael Dennis. (Loudcloud being the most prominent deposit received)

Best regards,
Pat McCall

EXHIBIT 779 PAGE 13

-----Original Message-----
**From:**      Ziv, Zohar
**Sent:**      Monday, July 10, 2000 8:31 PM
**To:**        McCall, Pat
**Cc:**        Welch, Bob
**Subject:**   RE: Michael Dennis

Pat,
Please provide Dave the correct split.
Thanks,
ZZ

-----Original Message-----
**From:**     McCall, Pat
**Sent:**     Wednesday, June 28, 2000 9:10 AM
**To:**       Ziv, Zohar
**Cc:**       Welch, Bob; Dennis, Michael
**Subject:**  Michael Dennis

Zo,

We need to produce the final numbers for Michael Dennis to reconcile his commissions
as a salesperson.

His last day is June 30th.  We can pay shortly thereafter as is our custom.

The Q1 report you generated for MD was good, but I think he is working on some
additions and will provide us with more info.

Michael has also been waiting for the December 99 splits.

This wait was caused by confused and inaccurate calculations by Steve Y. primarily
regarding Graig Murphy, but also with Linda Hammond, Jim Casserly, and Josh Orosco.

Also need April, May, and June to complete MD payments calcs to generate a final
check.

Let's discuss more by phone, and I will clarify.

Best regards,
Pat McCall

EXHIBIT 739 PAGE 14

## Michael Dennis

**From:** "Welch, Bob" <BWelch@IntellisysGroup.com>
**To:** <michaeldennis@mindspring.com>
**Sent:** Tuesday, October 10, 2000 4:52 PM
**Subject:** Commissions, etc.

Michael -
I don't know who for whom this is not a dark day - - other than MCSi. (As you may know Shedan was one of the primary MCSi visitors yesterday to our Northern California offices - I am not sure which one(s))

Summarizing our discussions about commissions:

* I had been informed that our records indicate you earned commissions through the first two quarters of the year which exceed any draws you had received by approximately $52,000 dollars. Of this amount, $26,000 has been paid.
* You have indicated that there is/may be some amount owing for December of last year, but neither you nor we have be able to define what that is or attributed to.
* I understand there may be another expense account, but I don't believe it has gotten to "corporate" yet.
* On Loud Cloud, you had requested an amount equal to 25% of the commission on it. We disagreed that we owed anything as a matter of commission. However, we did indicate that as a matter of good will that we would provide a going-away present that might approximate the amount. While you did not agree that the money was not owing, I believe you felt that if it was paid in any context it was moot.

Michael, I hope this is helpful.
- Bob

10/12/2000

EXHIBIT 739 PAGE 15

# EXECUTIVE EMPLOYMENT AGREEMENT

This Executive Employment Agreement (the "Agreement") is entered into by and between INTELLISYS GROUP, INC., a Delaware Corporation with its principle place of business in California (the "Company") and MICHAEL DENNIS (the "Executive"), a resident of the state of California. This Agreement is executed and is effective as of December 1, 1999. The Company and the Executive are sometimes referred to individually as a "party" and collectively as the "parties."

## RECITALS

A.    The Company is in the business of designing, engineering, sourcing, maintaining, servicing and integrating visual communications systems and systems integration (the "Business") for customers around the world.

B.    The Executive has substantial expertise in the Business and has been employed by the Company for many years in varying capacities and is currently employed as its Executive Vice President.

C.    For various reasons, the Executive and the Company have mutually agreed that the Executive shall remain employed by the Company on a full time basis for only another six (6) months and shall thereafter serve in a part-time "on-call" capacity for an additional twelve (12) months.

D.    The Company and the Executive desire to set forth the terms and conditions of the Executive's employment with and separation from the Company in writing.

## AGREEMENT

NOW, THEREFORE, in consideration of the above recitals and the mutual promises and conditions contained below, the parties hereby agree as follows:

## ARTICLE 1

## TITLE, DUTIES AND REPORTING RESPONSIBILITY DURING THE FULL-TIME EMPLOYMENT TERM

1.1    Title

During the remainder of the Executive's "Full Time Employment Term" (as defined below) with the Company, the Executive shall be employed as Executive Vice President.

1

EXHIBIT 739 PAGE 110

### 1.2    Duties and Reporting Responsibility

1.2.1   During the Full Time Employment Term, the Executive shall assume the role of sales team leader for that sales team known within the Company as South Bay #1 (the "Sales Team") and he shall report to the President or his designee.  The Executive shall perform those duties consistent with the position of sales team leader and such other duties as may be reasonably assigned to the Executive from time-to-time.

1.2.2   The Executive agrees that during the Full Time Employment Term (i) he shall to devote his full time, attention, efforts, energies, abilities and interests to the Business and affairs of the Company, and (ii) he will not accept outside employment of any kind or engage in any other activities which would be detrimental to the Company, inconsistent with the provisions of this Agreement or would otherwise impair his ability to perform his duties hereunder without the express written consent of the Company.

### 1.3    Place of Performance and Travel

The Executive agrees that during the Full Time Employment Term his duties shall be rendered at the Company's offices in southern and northern California offices and at such other place or places as the interests, needs, Business, or opportunity of the Company shall require. The Executive understands and agrees that the performance of his duties and responsibilities may require travel and work outside of regular business hours, but the Company will not make unreasonable requests in this regard.

## ARTICLE 2

## COMPENSATION AND BENEFITS DURING
## THE REMAINING FULL TIME EMPLOYMENT TERM

### 2.1    Salary

During the Full Time Employment Term, the Company shall pay the Executive as his base salary the sum of Twenty Thousand Eight Hundred Thirty Three Dollars and Thirty Three Cents ($20,833.33) per month (the "Base Salary") payable in accordance with the Company's normal payroll practices.

### 2.2    Commissions

During the Full Time Employment Term, the Executive shall also be eligible to receive commissions based upon his performance and the performance of the Sales team in accordance with the Company's 2000 Sales Commission Plan.

2

EXHIBIT 739 PAGE 17

2.3    <u>Other Benefits</u>.

During the Full Time Employment Term, the Executive shall be entitled to a pro rata share of his regular annual paid vacation, the continuation of his current automobile program as well as those other benefits including medical insurance, dental insurance, term life insurance, disability insurance, sick leave, holidays, participation in a 401(k) retirement plan etc. as are provided to other executive employees of the Company.  The specific details of the coverage and applicability of each of these benefits to the Executive and his dependents shall be governed by and be subject to the conditions set forth in the Company's Employee Manual and/or the documents governing a particular benefit plan, as the manual or plan may be amended or modified from time-to-time.

2.4    <u>1999 Incentive Compensation</u>.

The Executive shall receive an incentive compensation award in the amount of Thirty Seven Thousand Five Hundred Dollars ($37,500) for 1999, which award shall be payable in 2000 concurrently with the payment of incentive compensation awards to executives at a comparable level, but in no event later than April 1, 2000.

## ARTICLE 3

## <u>DUTIES AND RESPONSIBILITIES DURING THE "ON-CALL EMPLOYMENT TERM"</u>

3.1    <u>Duties</u>.

During the "On-Call Employment Term" (as defined below), the Executive shall make himself available to the Company two regular business (2) days per month (the "Required Days") to provide such advice on such matters consistent with the Executive's previous roles with the Company as and where the Company may reasonably request. The Company may also request that the Executive perform services on days in addition to the number of Required Days (the "Additional Days").  The Executive shall have the option of deciding whether to perform services on Additional Days.

3.2    <u>Timing</u>.

During the On-Call Employment Term, the Company shall endeavor to give the Executive reasonable notice of those Required Days on which his services will be required but in any event, no less than forty eight (48) hours notice, and shall provide the Executive with reasonable advance notice of any request for Additional Days.  The Executive shall make reasonable efforts to perform the Required Days of service on the days requested by the Company.

3

EXHIBIT 739 PAGE 18

# ARTICLE 4

## COMPENSATION AND BENEFITS FOR "ON-CALL" EMPLOYMENT

### 4.1   Monthly Salary and Additional Amounts.

4.1.1   In consideration for the Executive performing the services on the Required Days during the On-Call Employment Term, the Company shall continue to pay the Executive his Base Salary of Twenty Thousand Eight Hundred Thirty Three Dollars and Thirty-Three Cents ($20,833.33) per month.

4.1.2   Should the Executive perform any Additional Days of services for the Company during the On-Call Employment Term , he shall be paid, in addition to his Base Salary, a fee of One Thousand Five Hundred Dollars ($1, 500) for each Additional Day of services.

### 4.2   Payment.

The Base Salary and any additional compensation due for Additional Days shall be paid promptly and in accordance with the Company's normal payroll practices.

### 4.3   Benefits.

4.3.1   The Company shall endeavor to continue to provide the Executive with medical, dental, disability and life insurance under those benefit plans during the On-Call Employment Term.  In the event the Company is unable to continue the Executive's coverage under these plans during the On-Call Employment Term, the Company shall reimburse the Executive for the reasonable cost of his procuring comparable individual coverage.  The Company's obligations under this Section 4.3.1 shall terminate if the Executive obtains additional employment during the On-Call Employment Term and becomes eligible to participate in such other employer's benefit plans, provided such new benefit plans are substantially equivalent to those provided by the Company.

4.3.2   The Executive may continue to use the 1995 Company-leased BMW automobile during the On-Call Employment Term. The Executive shall be responsible for excess mileage during this period, and for any damage to the vehicle beyond normal wear-and-tear upon its return at the end of this agreement.

4.3.3   At the conclusion of the On-Call Employment Term, the Company shall give to Executive the IBM 570 laptop computer with port replicator which the Executive has used during his Full Time and On-Call Employment Term.

4.4.4   Except as specifically provided for in this Article IV or elsewhere in this Agreement, the Executive shall not be entitled to any other amounts or benefits during the On Call Employment Term.

4

EXHIBIT 739 PAGE 19

# ARTICLE V

## STOCK OPTIONS

5.1    Vesting.

5.1.1   The Executive shall continue to vest in those stock options previously granted to the Executive during the Full Time and On Call Employment Term.

5.1.2   Attached hereto as Exhibit A is a schedule reflecting the number of options currently vested in the Executive and the date and amount of additional stock options that will vest during the Full Time and On Call Employment Terms.

5.2    Exercise.

Upon the approval of the board of directors (by no later than May 31, 2000), the Executive shall have ninety (90) days from the termination of his employment under this Agreement to exercise any vested but unexercised stock options previously granted to the Executive.

5.3    Sale of Shares.

The Company will exercise all reasonable efforts to assist the Executive in selling his shares of Company stock obtained through the exercise of his stock options, including exploring with the Company's underwriters the possibility of including some or all of the Executive's shares of Company stock in any initial public offering ("IPO") on a pro rata basis with other shareholders, but only to the extent permissible under applicable law.

5.4    Continuing Viability of Stock Option Agreements.

Except as otherwise modified by this Article 5, the terms of the applicable stock option agreements pursuant to which the Executive's stock options were granted shall remain in force and effect.

5

EXHIBIT 739 PAGE 20

# ARTICLE 6

## BUSINESS EXPENSES

### 6.1     Expenses Reimbursement.

The Company shall reimburse the Executive for all reasonable and necessary expenses incurred by the Executive in performing his duties and responsibilities in connection with the services to be rendered by the Executive to the Company hereunder provided that the Executive submit to the Company, when requested, an accounting and appropriate verification of all such expenses.

# ARTICLE 7

## TERM AND TERMINATION OF AGREEMENT

### 7.1     Term of Agreement.

7.1.1   Subject to the provisions of this Article 7, the Executive shall remain employed by the Company on a full time basis from December 1, 1999 through May 31, 2000 (the "Full Time Employment Term"), and he shall be automatically deemed to have resigned his positions as an officer and a full time employee of the Company effective as of the close of business on May 31, 2000 without any further action.  At the election of the Company, this Full Time Employment Term may be extended by one month to extend through June 30, 2000 by written notice to the Executive on or before May 1, 2000.  The Executive's "deemed resignation" under this section 7.1.1 shall not trigger the provisions of section 7.4.1 below and shall not be deemed to be a "resignation" for purposes of those Stock Option Agreements to which the Executive is a party.

7.1.2   Subject to the provisions of this Article 7, the Executive shall become a part time on-call employee of the Company for the period commencing on June 1, 2000 (or July 1, 2000 if the Company chooses to extend the Full Time Employment Term for an additional month) and ending on May 31, 2001 (the "On-Call Employment Term").  The Executive's employment relationship with the Company shall finally, completely and automatically terminate at the close of business on May 31, 2001, regardless of whether the Company chooses to extend the Full Time Employment Term as provided under 7.1, above

### 7.2     Death or Disability.

7.2.1   Except as specifically set forth in this Agreement, the Company may terminate this Agreement without any further obligation to the Executive on the death or disability of the Executive.  For the purposes of this section "disability" shall mean the Executive's inability to perform his assigned duties as a full time or on call employee for the Company for sixty (60) calendar days in any six (6) month period as a result of incapacity due to medically documented physical or mental illness and which, in the opinion of a physician

6

EXHIBIT 739 PAGE 21

mutually agreed upon by the Company and the Executive, makes it impossible for the Executive to perform his duties and responsibilities under this Agreement.

### 7.3    Termination for Cause.

Subject to the provisions of this Section 7.3., the Company may terminate this Agreement at any time without any further obligation to the Executive for "Cause" as defined herein except that the Executive shall be entitled to his Base Salary through the date of termination. For the purposes of this Agreement, "Cause" shall mean (i) the Executive's conviction of a felony or a misdemeanor involving moral turpitude; (ii) dishonest or illegal conduct by the Executive; (iii) the Executive's breach of any of the provisions of this Agreement including, but not limited to, the provisions set forth in Article 8; (iv) the Executive's substantial neglect of his duties under this Agreement during the Full Time Employment Term; (v) the Executive's significant non-performance of the Executive's duties during the Full Time Employment Term as determined by the Company; and (vi) the Executive's unexcused failure or refusal to provide the Required Days of services in any month during the On-Call Employment Term; provided, however, that in the event of (iv) or (v) the Company shall first have given the Executive thirty (30) days advance written notice of the alleged breach or areas of neglect or unsatisfactory performance and a reasonable opportunity to cure.

### 7.4    Resignation.

7.4.1   If the Executive resigns his employment with the Company during the remainder of his full time or on-call employment for other than "Good Reason" (as defined below), this Agreement shall be deemed terminated without any further obligation of the Company to the Executive except as specifically provided by this Agreement.

7.4.2   The Executive shall be entitled to resign his employment with the Company for "Good Reason" at any time during the remainder of his full time or on-call employment. If the Executive resigns for Good Reason, he shall be paid his Base Salary for the remaining term of his full time or on-call employment, as applicable.

7.4.3   For the purposes of this Section 7.4, "Good Reason" shall mean (i) during the remaining Full Time Employment Term, the assignment to the Executive of duties inconsistent with the duties of a sales team leader or the Executive's recent roles, and (ii) during the On-Call Employment Term, the assignment of duties to the Executive which are demeaning and wholly inconsistent with the duties normally assigned to a professional consultant.

7.4.4   To be considered an effective resignation for Good Reason, the Executive must provide the Company with a written notice that he is resigning for Good Reason within fifteen (15) days of the event(s) or assignments giving rise to the resignation, and giving the Company a reasonable opportunity to correct, alter or modify the event or assignment, as applicable.

EXHIBIT 17A PAGE 22

7.4.5  Except as specifically set forth in this Section 7.4, the Company shall have no liability to the Executive under this Agreement if he resigns his employment for Good Reason.

## ARTICLE 8

## CONFIDENTIALITY AND UNFAIR COMPETITION

### 8.1    Confidential Information

At all times during and after the term of this Agreement, the Executive shall hold in strictest confidence and not disclose, directly or indirectly, to any person, firm or corporation, without the express written prior authorization of the Company, any trade secrets or any confidential business information, including but not limited to, corporate planning, production, distribution or marketing processes; manufacturing techniques; customer lists or customer leads; marketing information or procedures; development or environmental work; work in process; financial statements or notes, schedules or supporting financial data; or any other secret or confidential matter relating to the products, sales or business of the Company, including plans for expansion to new products, areas and markets; new product development budgets and forecasts, together with all written and graphic materials relating thereto.

### 8.2    Inventions and Improvements

8.2.1  If during the term of the Executive's employment, the Executive conceives or makes any improvement, discovery or invention relating to any article, machine, process, or composition of matter, made, used, sold or under development by the Company, or pertaining to the business of the Company, the Executive agrees to fully and promptly disclose the same to the Company. Each such improvement, discovery and invention shall be the exclusive property of the Company. The Executive further agrees that he will promptly make full disclosure to the Company, and will hold in trust for the sole right and benefit of the Company, any inventions, discoveries, developments, improvements or trade secrets which the Executive solely or jointly conceives or develops, or reduces to practice, or causes to be conceived, or developed, or reduced to practice, during the period of the Executive's employment with the Company which relate to or are connected with the Executive's employment, or the work, processes, techniques, formulas, products, experiments, or developments or any of the work or business of the Company. The Executive assigns to the Company all of his right, title and interest in and to all such inventions, discoveries, developments, improvements, and trade secrets and agrees that he will, at the request of the Company, whether made by the Company during or after the termination of the Executive's employment, and without expense to the Executive, make, execute and deliver all applications, assignments or instruments, and perform or cause to be performed, such other lawful acts as the Company may deem necessary or desirable in making or prosecuting applications, domestic or foreign, for patents, trademarks, or copyrights, or which may be procured with respect to any of the foregoing.

EXHIBIT 739 PAGE 23

8.2.1   The parties agree that the provisions contained in this Section 8.2 shall not be construed as a waiver by the Company of its shop rights and any other improvement, discovery or invention developed during the working hours or times for which the Executive shall be compensated by the Company or developed by the use of materials, facilities or information furnished by the Company.

8.2.2   The foregoing notwithstanding, this Agreement is not intended to apply to that certain "convergence device" and associated hardware and software (collectively the "Device") developed by the Executive.  The Company acknowledges and agrees that the Executive owns all right, title and interest to the Device.

8.3   Return of Confidential Information

The Executive further agrees that within five (5) calendar days after the termination or resignation of the Executive's full time employment, he will make reasonable best efforts to deliver to the Company and will not keep in his possession, or deliver to anyone else, any and all drawings, blueprints, notes, memoranda, specifications, financial statements, customer lists, product surveys, data, documents, or other material contained or disclosing any of the matters referred to herein together with all photocopies of the above.

8.4   No Solicitation

8.4.1   In consideration for the compensation and other benefits to be provided to the Executive under this Agreement, the Executive agrees that he shall not during the term of this Agreement or at any time prior to May 31, 2001 (the anticipated termination of the Executive's employment with the Company), solicit, attempt to solicit or facilitate the solicitation of any employees, officers, personnel or other representatives of the Company to work for, render services or provide advice to, or supply confidential business information or trade secrets of the Company to any third person, firm or corporation.

8.4.2   In consideration for the compensation and other benefits to be provided to the Executive under this Agreement, the Executive agrees that he shall not, either during the term of this Agreement or at any time prior to May 31, 2001 (the anticipated termination of the Executive's employment with the Company), call on or solicit or divert or take away from the Company (including without limitation by divulging information to any competitor or potential competitor of the Company) any person, firm, corporation or other entity who is or was a customer of the Company at any time during the Executive's employment with the Company or any such prospective customer of the Company (i) who has a pending request that the Company provide a written proposal or (ii) to whom the Company has submitted a written proposal which is pending, at the time of the termination of this Agreement.

8.5   No Competition

9

EXHIBIT 779 PAGE 24

8.5.1  In consideration for the compensation and other benefits to be provided to the Executive under this Agreement and except as set forth in section 8.5.2 below, the Executive agrees that he shall not, either during the term of this Agreement or at any time prior to May 31, 2001 (the anticipated termination of the Executive's employment with the Company), without the Company's prior written consent (which may be given or withheld in Company's sole and absolute discretion), directly or indirectly, own, manage, join, operate or control, or participate in the ownership, management, operation or control of, or be connected as a director, officer, employee, partner, consultant or otherwise with, or permit his name to be used by or in connection with, any profit or non-profit business or organization which produces, designs, conducts research on, provides, sells, distributes or markets products, goods, equipment or services which, directly or indirectly, compete with the Company's Business, as conducted by the Company or is proposed to be conducted by the Company at the time this Agreement is terminated.

8.5.2  The foregoing notwithstanding, nothing in this section 8.5 shall be deemed to apply to the Executive's ownership, operation, control, employment with or participation in any Business which is limited to (i) the home and residential marketplace (including the provision of equipment for telecommuters in their home or place of residence), (ii) audio visual web commerce exclusively for the home and residential marketplace and/or (iii) the rental of audio visual equipment in connection with the staging of trade shows, events and conventions.

8.6    Remedy for Breach of Article 8

8.6.1  The Executive acknowledges that any breach of any of the provisions of this Article 8 by him will cause irreparable damage to the Company and its affiliates, for which the available remedies at law will not be adequate.  Accordingly, in the event of any such breach or threatened breach of any of the provisions of this Article 8, in and addition to any other remedy provided herein or by law or in equity, the Company shall be entitled to appropriate injunctive relief, in any court of competent jurisdiction, restraining the Executive or any of the Executive's associates or affiliates from any threatened or actual violation of the provisions of this Article 8.  The Executive stipulates to the entry against the Executive of any such temporary, preliminary or permanent injunction, and agrees not to resist the Company's application for such equitable relief, except on the grounds that the acts or omissions alleged by the Company did not violate any of the provisions of this Section 8.  The Executive shall, in the event that any injunctive relief or damages shall be granted to the Company, pay all of the Company's cost and expenses incurred in obtaining such injunctive relief, including but not limited to, the Company's reasonable attorney's fees.

8.6.2  In addition to the relief provided pursuant to section 8.6.1, then in the event it is determined that the Executive breached of any of the provisions of this Article 8, the Executive shall be required to repay to the Company any Required Consulting Fees paid to him by the Company pursuant to this Agreement.

ARTICLE 9

10

EXHIBIT 739 PAGE 25

## TRANSITION, DISPARAGEMENT AND CONFIDENTIALITY

### 9.1    Transition.

The parties agree that they shall make every effort to insure a smooth and amicable transition for the Executive from his role as a full-time employee to on-call employee.

### 9.2    No Disparagement

The parties agree to characterize the Executive's transition to all relevant persons in a positive manner and further agree not to make any negative or disparaging remarks to any person or persons about the other (or any of their directors, officers or employees) either in writing or orally.

### 9.3 ·   Confidentiality

The Executive agrees to keep confidential and not disclose any of the terms of this Agreement to any person whatsoever (including, but not limited to, any current or former employees of the Company) except his attorneys and tax advisors, unless required to do so by law.  The Company agrees to keep confidential and not disclose any of the terms of this Agreement to any person whatsoever except those Company personnel with a specific need to know and its attorneys and tax advisors unless required to do so by law.

## ARTICLE 10

## ARBITRATION

### 10.1   Exclusive Dispute Resolution Mechanism

10.1.1  The Executive and the Company agree that except with respect to any action for an injunction pursuant to the provisions of Article 8 above, any and all disputes relating to, or arising out of this Agreement or the Executive's employment with the Company, or any amounts claimed due hereunder shall be submitted to the Judicial Arbitration and Mediation Service ("JAMS") for mediation first, and in the event mediation is unsuccessful, then for arbitration before a retired state or federal court judge in accordance with the rules of JAMS then in force and effect as the sole and exclusive remedy for resolving such controversies.  If either party commences an arbitration without first submitting the dispute to mediation before JAMS, that party shall not be entitled to recover his or its costs and expenses, including reasonable attorneys' fees, incurred in connection with the arbitration under section 10.3 below.

10.1.2  Without limiting the generality of the foregoing, the disputes required to be submitted to arbitration include any disputes arising out of, based upon or in any

11

EXHIBIT 739 PAGE 26

way related to (i) the termination of this Agreement, the Executive's employment with the Company, the termination of the Executive's employment, or the payments due the Executive hereunder; (ii) any property, contract or tort claims, including wrongful discharge, breach of employment contract, breach of the covenant of good faith and fair dealing, retaliation, intentional or negligent infliction of emotional distress, tortious interference with existing or prospective economic advantage, negligence, misrepresentation, breach of privacy, defamation, loss of consortium, breach of fiduciary duty, violation of public policy or any other common law claim of any kind; (iii) any violation or alleged violation of Title VII of the Civil Rights Act of 1964, as amended, the Age Discrimination in Employment Act, as amended, the Older Workers Benefit Protection Act of 1990, the Equal Pay Act, as amended, the Fair Labor Standards Act, the Employee Retirement Income Security Act, the Americans With Disabilities Act, the Family and Medical Leave Act, the California Family Rights Act, the California Fair Employment and Housing Act, the California Labor Code, the California Unemployment Insurance Act, the California Workers' Compensation Act, the Civil Rights Act of 1866, the Consolidated Omnibus Budget Reconciliation Act, California Labor Code § 1102.5; (iv) any laws of the State of Colorado relating to discrimination in employment or workers' compensation; (v) any claims for severance pay, bonus, sick leave, vacation or holiday pay, life insurance, health, disability or medical insurance or any other fringe benefit; and (vi) any claim relating to or arising under any other local, state or federal statute or principle of common law (whether in contract or in tort) governing the employment of individuals, discrimination in employment and/or the payment of wages or benefits.

        10.1.3  The Executive and the Company agree that the decision of the arbitrator shall be final and binding and that a judgment may be entered on such arbitration award in any court of competent jurisdiction.  The parties agree that no damages may be sought or awarded in any such arbitration other than those specifically set forth in this Agreement.  The parties agree that any such arbitration shall take place in the County of Santa Clara, State of California.

        10.2   <u>Waiver of Right to Jury Trial</u>

        THE EXECUTIVE AND THE COMPANY EACH ACKNOWLEDGE AND AGREE THAT BY SELECTING ARBITRATION AS THE SOLE AND EXCLUSIVE REMEDY FOR RESOLVING ALL DISPUTES AMONG THEM (OTHER THAN THOSE SET FORTH IN ARTICLE 8), THEY ARE WAIVING THEIR RIGHT TO A JURY TRIAL TO WHICH THEY MAY OTHERWISE BE ENTITLED.

        10.3   <u>Attorneys' Fees and Costs</u>

        If any party to this Agreement brings an arbitration to enforce or determine his or its rights hereunder or brings any action under the terms of Article 8 above, the prevailing party shall be entitled to recover his or its costs and expenses, including reasonable attorneys' fees, incurred in connection with such arbitration or action.

ARTICLE 11

12

EXHIBIT 739 PAGE 27

## INDEMNIFICATION

### 11.1    Scope.

Except as set forth below, the Company shall defend, indemnify and hold harmless the Executive from any claim, charge, action, suit or proceeding whether criminal, civil or administrative (subject to the applicable provisions of law) which in any way relates to the performance of his duties while employed by the Company (a "Claim"). Without limiting the generality of the foregoing, the indemnification shall apply to the Executive's costs and expenses (including reasonable attorneys' fees), judgments and settlements incurred in connection with a Claim. The foregoing notwithstanding, the Executive shall not be entitled to indemnification to the extent that such Claim is the result of the Executive's gross negligence, willful misconduct or fraud.

### 11.2    Notice.

The Executive shall promptly notify the Company of any Claim which is asserted against him.

### ARTICLE 12

### MISCELLANEOUS

### 12.1    Reasonable Terms.

The parties agree that the covenants and other terms contained in this Agreement are reasonable in all respects.

### 12.2    Invalid Provision.

The parties agree that each and every paragraph, sentence, term and provision of this Agreement shall be considered severable and that, in the event a court or other tribunal finds any paragraph, sentence, term or provision to be invalid or unenforceable, the validity, enforceability, operation or effect of the remaining paragraphs, sentences, terms or provisions shall not be affected.

### 12.3    No Waiver.

The failure of either party to insist in any one or more instances upon performance of any of the provisions of the Agreement or to pursue their rights hereunder, shall not be construed as a waiver of any such provisions or the relinquishment of any rights.

### 12.4    Governing Law.

13

EXHIBIT 739 PAGE 28

This Agreement has been consummated in the State of California and shall be construed and enforced in accordance with and governed by the laws of that state. The parties agree that the language of this Agreement shall not be construed for or against any particular party.

### 12.5   Notices.

Any notices, requests or other communications required hereunder shall be in writing and shall be personally delivered or, if mailed, by first class mail, (i) to the Company at its headquarters and (ii) to the Executive at his place of residence.

### 12.6   Entire Agreement.

Except for the Executive's stock option agreements referred to in section 5.4 above, this Agreement represents the sole and entire agreement among the Executive and the Company relating to the Executive's employment and supersedes all prior promises, contracts and agreements of any kind, whether written or oral, express or implied, as well as any negotiations and/or discussions between the parties hereto. The Executive also agrees that no promises or commitments have been made by the Company to the Executive regarding any other term or condition of his employment, except as specifically provided herein and the Executive understands that no representative of the Company other than the President or the Chairman of the Board is authorized to enter into any agreement or make any commitment with Executive which is in any way inconsistent with the terms of this Agreement. Any amendment to this Agreement must be in writing and signed by duly authorized representatives of each of the parties hereto and must expressly state that it is the intention of each of the parties hereto to amend this Agreement.

EXHIBIT 779 PAGE 29

## EXHIBIT A

## STOCK OPTION GRANTS – MICHAEL DENNIS

| Date of grant | No. of Shares | Exercise Price | As of 1/31/2000 Vested | As of 1/31/2000 Unvested | As of 6/31/2000 Vested | As of 6/31/2000 Unvested | As of 5/31/2001 Vested | As of 5/31/2001 Unvested |
|---|---|---|---|---|---|---|---|---|
| March 4, 1994 | 142,438 | 0.0002 | 142,438 | - 0 - | 142,438 | - 0 - | 142,438 | - 0 - |
| January 1, 1996 | 20,232 | 0.7414 | 16,185 | 4,047 | 16,185 | 4,047 | 20,232 | - 0 - |
| May 19, 1997 | 20,232 | 0.7414 | 8,092 | 12,140 | 12,139 | 8,093 | 16,185 | 4,047 |
| February 1, 1998 | 80,931 | 1.4827 | 16,186 | 64745 | 32,372 | 48,559 | 48,559 | 32,372 |
| December 16, 1999[B] | 30,000 | 9.50 | 0 | 30,000 | 6,000 | 24,000 | 12,000 | 18,000 |
| TOTALS | 293,833 | | 182,901 | 110,932 | 209,134 | 84,699 | 239,413 | 54,420 |

Shares and prices indicated are both post-splits(2): one in October, 1994 at 100:1; the second in October, 1998 at
4.046550221:1

[B] While the grant date is December 16, 1999, the vesting commencement date is May 1, 1999.

EXHIBIT 739 PAGE 30

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I. Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: 10250 Constellation Boulevard, Suite 1700, Los Angeles, California 90067.

A true and correct copy of the foregoing document described as **NOTICE OF MOTION AND MOTION FOR ORDER DISALLOWING PRIORITY TREAMENT FOR THE MAJORITY OF CLAIM NO. 739; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF DAVID GOTTLIEB IN SUPPORT THEREOF** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

I. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On **January 30, 2012** I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

- United States Trustee (SV)    ustpregion16.wh.ecf@usdoj.gov

☐ Service information continued on attached page

II. **SERVED BY U.S. MAIL** (indicate method for each person or entity served):
On **January 30, 2012,** I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

The Honorable Alan M. Ahart
U.S. Bankruptcy Court
21041 Burbank Blvd., #342
Woodland Hills, CA 91367

Michael Dennis
c/o Michael L. Kadish, Esq.
2005 Hamilton Ave., Ste. 230
San Jose, CA 95125

☐ Service information continued on attached page

III. **SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **Fill in Date Document is Filed,** I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| January 30, 2012 | Katie Finn | _Katie Finn_ |
|---|---|---|
| Date | Type Name | Signature |